The plaintiff purchased the claim in suit of one Klotwig, and it was for the price or value of certain pine logs, sold by Klotwig to the defendants in April, 1859. At that time Klotwig and the defendants owned saw-mills respectively, upon the same river, or stream, and a portion of the logs were in the stream, and some of them mixed in with the logs of the defendants. The logs had been cut by Klotwig from trees standing upon the land of one Le Roy, and put in part into the stream some miles above the saw mills. Logs so *Page 225 
put in the stream were driven down, during a freshet, to the mills. Evidence was given by both parties tending to prove the contract of sale, though there was some conflict as to its terms: also tending to prove a full performance of the contract by Klotwig, and evidence to the contrary. One of the defences was, that the logs were not the property of Klotwig but the property of Le Roy, who had made a claim upon the defendants, or rather had asserted his title, or forbid the defendants paying Klotwig. There was also a defence of a counter-claim or set-off.
The evidence showed that the logs were cut from timber, standing upon the land of Le Roy, and that Klotwig cut the timber into logs, under a contract made with one Stewart, the agent of Le Roy, to purchase the timber, at three dollars a thousand feet. When the logs should be cut, Klotwig was to inform Stewart, who was to have them measured, and Klotwig was to come and settle for the logs; in the meantime the logs were not to be moved, and were to remain Le Roy's until they were paid for. Klotwig, at the time of the sale to the defendants, had not notified Stewart, or paid for the logs. Prince, one of the defendants, informed Stewart, early in the summer, that he had purchased the logs of Klotwig, and wanted to know what Stewart would do about it, and Stewart told him Klotwig had not performed the contract, and forbid his paying him. Stewart was satisfied with the responsibility of Klotwig and also of Prince. Klotwig, in June, 1860, made a payment to Stewart on account of the logs and took a receipt. It appeared that Prince, as early as May 5th, 1859, had been apprised of Stewart's claim, and he then told Klotwig, who called upon him to settle, that Stewart had forbid his paying Klotwig, and at that time Klotwig said that Stewart claimed the stumpage. Prince also alleged that Klotwig had previously sawed some of his logs, and that he must pay for them, and Klotwig was willing that from seventy-five to one hundred dollars should be taken out of his claim, for the logs sold, on account of the logs he had used belonging to the defendants. This was the item of set-off or counter-claim *Page 226 
submitted to the jury. At this time Prince told Klotwig that he must put in the rest of the logs. The claim in suit was assigned to the plaintiff June 24th, 1859, and the plaintiff, before and after the purchase of the claim, had conversations with Prince, and presented the claim, after it was assigned to him, to Prince, for payment. The evidence proved, or tended strongly to prove, that Prince claimed that all the logs were not put in and marked; some twenty or thirty not put in: that when they were marked and put in, Klotwig's contract would be fulfilled, and he would pay. That in some of these conversations, he spoke of Stewart's claim, and that the plaintiff told him if he set that up as a defence he would sue him immediately, and that Prince desired him not to sue, and promised to pay the plaintiff. These conversations were several months before this action was commenced. There were some exceptions taken during the trial, but it will not be necessary to notice them. At the close of the evidence, the defendants moved for a nonsuit, on the ground, among others, that the logs in question were not Klotwig's at the time of the sale, but Le Roy's, which fact Klotwig knew, when he sold them to the defendants, as his own. The motion was denied, and the defendants excepted. After the charge the defendants' counsel requested the court to direct a verdict for the defendants, upon the same ground stated in the motion for a nonsuit. Refusal and exception. There was a verdict for the plaintiff, for eighty-six dollars which was set aside and a new trial granted, upon the ground that the court erred in not instructing the jury that the plaintiff could not recover for the reason stated. This result was reached by assuming, as a fact, that the title to the logs, at the time Klotwig sold them to the defendants, was not in him, but in Le Roy, and that Klotwig knew this fact, and concealed it from the vendees — the defendants — and that he was therefore guilty of deceit or fraud, and that such facts constituted a complete defence to the action for the price or value of the logs.
If this, as a legal proposition, were entirely sound, in the *Page 227 
absence of any other facts, it is not properly applicable to this case, and it would have been error to nonsuit, or give the instruction requested. It is a little remarkable that no notice is taken in the charge, or in the opinion delivered on granting a new trial, or at the general term, of the evidence tending to prove a full ratification of the sale by the defendants, after they had full knowledge of all the material facts. They knew of Le Roy's claim as early as the 5th of May, when Klotwig called upon them to settle, and they then claimed that Klotwig had not fully performed his agreement; that he had not got in, and marked all the logs, and requested him to complete the performance of the contract. At the same time they made a claim for logs of theirs which Klotwig had used, and Klotwig consented (the defendant, Prince, says), that they might take out of his claim from seventy-five to one hundred dollars on account of their claim, for logs used by him, thus making a new bargain or modifying the original one. This evidence was properly submitted to the jury, as evidence of a counter-claim or set-off, and I infer from the verdict that it was allowed.
At this time most, if not all, of the logs were in the river, some driven down, and some not.
Again the evidence tended strongly to show that with a full knowledge of the facts, the defendants promised to pay the claim to the plaintiff after it was assigned to him. If the defendants intended to make any question of deceit or fraud, or to raise the question of title in Klotwig, or his right to sell they should have raised the question at the time the facts came to their knowledge, and not have proceeded with the contract, by driving the logs to their mills, and converting them to their use. A buyer who is imposed upon by a fraud, and has a right to annul the sale, must exercise the right as soon as may be, after discovering the fraud. (Parsons' Mer. Law, 57; Masson v.Bovet, 1 Den., 69; Saratoga Schenectady R.R. Co. v. Row,
24 Wend., 74; Ross on Comm. L., 439; Campbell v. Fleming, 1 Ad., 611, 40.) The general rule is that he cannot retain the property, and entirely defeat a recovery *Page 228 
upon the contract of sale, on account of the fraud, in case the property was of any value. But in this case there was a waiver of any right to set up deceit or fraud in the defence. With full knowledge of the alleged deceit or fraud, the defendants offered to perform the contract upon the allowance to them of from seventy-five dollars to one hundred dollars, their claim for logs used by Klotwig, to be abated from the sum they were to pay; and the evidence tends to show that Klotwig assented to this. This was a claim which, in the absence of a special agreement, could not have been used as a counter-claim or set-off. (Par. Mer. L., 57; Bly v. Welsh, Baldw., 331.)
The effect of this waiver was simply to trust to Klotwig's paying to Stewart the claim of Le Roy, for the price of the timber, three dollars a thousand, and Klotwig was responsible. Though the legal title in the logs was in Le Roy, the largest interest in value was in Klotwig, under his contract to purchase the timber, and upon his performing his contract with Le Roy, by paying the three dollars a thousand, (and this was all that Stewart, the agent, demanded,) the legal title would be in Klotwig, or trusting to Klotwig's responsibility upon his implied warranty of title. If there was any deceit or fraud in the sale, it was under the circumstances so far waived, that the defendants could not use it, to any extent, or for any purpose, as a defence in this action; and a nonsuit, or direction to the jury, to render a verdict for the defendants, would have been erroneous. It follows that the order granting a new trial, upon the exceptions as above stated, was wrong, and it should have been reversed by the general term, and should now be reversed by this court. It will be noticed that I have thus far proceeded upon the assumption that the law is as held by the court below. I am not prepared to admit that such is the law in this state; no case in support of such position has been found, so far as I know, in this country; and I think our law is in conflict with it. There are some old English cases, which it is claimed, are authority for such position, and upon which the decision below was made, or rather mainly upon the text in Blackstone's Commentaries and Esp. Nisi *Page 229 
Prius founded upon the cases. The latter author, under the title of injuries from deceit in sales, states the rule, and refers for authority to Furnis v. Leicester, Cro. Jac., 474; Cross v.Gardner, Show., 68, and Medina v. Stoughton, 1 Salk., 210. In the first of these cases the seller stated to the buyer, that the sheep were his own sheep, when in truth they were the sheep of another person. The action was upon the case in the nature of deceit, and was held to lie, though the seller, as the case says, made no express warranty, and it was also held that the action would lie before the owner of the sheep had seized them, or interrupted the buyer. In Cross v. Gardner it was averred in the declaration that the defendant falsely and maliciously affirmed that the oxen were his proper goods, c. The plaintiff gave credit to this affirmation, bought the oxen, and the true owner recovered them of him. It was objected that the declaration was not good, as it stated no warranty or scienter, but the court held that the affirmation was enough (see this case in Chit. on Contracts, 353); and upon it the author remarks: This case seems to be maintainable, either upon the ground that the defendant's affirmation, under such circumstances, amounted to a warranty, or upon the ground that the assertion of such a fact, not known to be true, is under such circumstances, as much a fraud or deceit in law, as an untrue affirmation of a fact known to be false. We shall presently see the pertinency of these remarks, in support of which he cited Adamson v. Jarvis (4 Bing., 66). In the next case, Medina v. Stoughton, the seller affirmed the lottery ticket to be his own, and it was held that this amounted to a warranty. It does not appear from the report in Salk. whether the plaintiff had been compelled to respond to the real owner. I infer that he had. The case was decided upon demurrer and is briefly reported.
In Adamson v. Jarvis the defendant was in possession of the goods, and represented and affirmed to the plaintiff that he had authority to dispose of them, and requested the plaintiff to sell them for him. The plaintiff sold the property, and paid the proceeds to the defendant. A recovery was had by *Page 230 
the owner of the goods, against the plaintiff, who was allowed to recover against the defendant. BEST, Ch. J., after citing some of the above cases, says, that these cases rest upon this principle, that if a man having the possession of property, which gives him the character of owner, affirms that he is owner, and thereby induces a man to buy, when, in point of fact, the affirmant is not the owner, he is liable to an action, upon the principle that he who affirms, either what he does not know to be true, or knows to be false, to another's prejudice, and his own gain, is, both in morality and law, guilty of falsehood and must answer in damages.
Thus, it is seen that in all the cases there were affirmations, declarations, or representations of title in the vendor, or of a right to dispose of the property. In some of the cases, the declarations, c., were held to be express warranties, and in others, that they were made fraudulently, and that the purchaser was thereby deceived. In Furnis v. Leicester it was held, in a case of deceit or fraud, that the action would lie, before the purchaser had been disturbed in his possession by the real owner of the property, and this is the only case so holding, so far as I have discovered. According to Chitty on Contracts, it seems to have been understood that by the English law there was no implied warranty, as such, upon the sale of goods, that the vendor has title, and in the absence of express warranty or fraud the vendor has no remedy upon a failure of title. (Chit. on Contracts, 353-355.) With such an understanding of the law, the courts might well be astute in finding a remedy, as upon an express warranty, or for deceit or fraud. With us it has long been settled that in every sale of goods, in the possession of the vendor, there is an implied warranty of title in the vendor. (Pars. on Cont., 459; 1 Johns., 274; 6 id., 5; 20 id., 196; 3 Caines, 272.)
I must not be understood as denying that the vendor may be guilty of a fraud touching the title, though the law annexed to the sale an implied warranty of title, nor shall I assert that this fraud may not arise out of an intentional concealment of the state of the title. There may be cases in which *Page 231 
it is the duty of the vendor to disclose fully to the vendee the title of the property, and if he does not, the circumstances may be such as to satisfy a jury that the vendor intended a fraud, and the remedy, upon the implied warranty, may be inadequate. As to the duty of mutual disclosures and intentional concealments, or suppression of material facts in making a contract, see 2 Kent Com., 482, et seq. The case under consideration cannot be brought within any such principle.
Klotwig had purchased the timber and converted it into logs, by his own labor, thus greatly increasing its value, and by his contract he was to have the title to the logs, upon paying the contract price for the timber. He was responsible. He sold and delivered the logs to the defendants, knowing that he had not a complete title, and saying nothing about the title, and under these circumstances the court was requested to hold, as a question of law, that no recovery could be had against the defendants, though they had not been disturbed in their possession of the property by the real owner. There was no request to submit the question to the jury, as one of fraud. The question was also confined to the facts, as they existed at the time of the sale to the defendants, and if the position taken by the defendants' counsel was sound, I do not see that it would have made any difference if Klotwig had gone and paid Le Roy at any time, after the sale to the defendants.
The effect of the implied warranty of title is to impose upon the vendor the obligation that the vendee shall be safe from eviction or disappointment from other parties. (Bell on Cont. of Sale, 95.) This author also says, that, strictly speaking, eviction is by judicial sentence only, but when a clear right appears in the evictor, and the only consequence of resistance would be to accumulate expenses, the buyer will be entitled to abandon the thing and to insist upon the seller's warranty. InVibbard v. Johnson (19 Johns., 77), the purchaser had knowledge of the condition of the title, or rather that it was claimed that the property belonged to a person other than his vendor, and he was not allowed to pay such other person voluntarily, and set up his title as a defence in the action by *Page 232 
his vendor for the price. As fraud vitiates all contracts at the election of the party defrauded, such party, in the case of sales of property, if he desires to be entirely relieved from the contract, must make his election promptly, upon discovering the fraud. If the vendor has been defrauded in the contract of sale, he may rescind the contract and reclaim his goods while they remain in the possession of the vendee, or one who is not a bonafide purchaser, but he must, in such case, restore to the vendee what he had received from him. And this rule, by some of the above authorities, applies equally to vendees who have been induced to purchase by fraud. If they desire to be entirely relieved from the contract, they must rescind it, and restore, or offer to restore, the property purchased. If they retain the property, they may, when sued for the price of it, recoup the damages arising from the fraud, or they may have an action to recover such damages. But they cannot retain the property, if it is of any value, and defeat a recovery in toto upon the contract, by reason of the fraud. These principles have been well settled in numerous cases, arising between vendor and vendee, where, however, the question of fraud did not relate to the title of the vendor. What may the vendee do in such a case. May he, on discovering the fraud, return the property to the vendor? It may be that the true owner had demanded the property of him, or that he will be liable to such owner, though he should return the property to his vendor. It seems to me that in such a case he may return or abandon the property to the true owner, he, of course, assuming the responsibility, when sued by his vendor, of showing the fraud, and showing that the property belonged to the person whose title he had recognized and to whom he had abandoned it, and that such person, as against his vendor, was entitled to the possession of the property.
I also think that the same rule will apply in the case of an implied warranty of title in the vendor, when the vendee had no notice of any claim by the true owner. When the purchaser is satisfied that the claimant of the property is the true *Page 233 
owner, and can and will in an action against him recover the property from him, or its value, I do not think he will be bound to resist the claim of such owner, but he may abandon the property to the true owner without action, taking upon himself the onus of showing, if sued for the price by his vendor, that his vendee had no title to the property, or right to dispose of it, and that he to whom he had surrendered the property, upon claim, had the title and the right to possession.
The covenant for quiet enjoyment is not broken until there has been a lawful eviction by paramount title. Such eviction need not, however, be by process of law. If a valid claim is made by a third person under a title paramount, the plaintiff may voluntarily yield up possession, assuming the burden of proving that the person entering had title paramount. (Greenvault v.Davis, 4 Hill, 643; St. John v. Palmer, 5 Hill, 599;Fowler v. Poling, 6 Barb., 165; Hamilton v. Cutts,4 Mass., 349.) I think the law is the same in relation to the breach of the implied warranty of title in the vendor of personal property.
The order appealed from should be reversed, and the plaintiff should have judgment upon the verdict.
All the judges concurring,
Order reversed and judgment for the plaintiff.